# EXHIBIT 1

**INTL·FCStone'**

## INTL FCSTONE MARKETS, LLC

### TERMS OF BUSINESS

This Terms of Business agreement for swaps and over-the-counter (OTC) derivatives (the "Agreement") is dated 9/12/2017 between INTL FCStone Markets, LLC, an Iowa limited liability company ("IFM") and

AGRO SANTINO OOD

an eligible contract participant ("ECP") within the meaning of Section 1a(18) of the Commodity Exchange Act, as amended organized under the laws of Bulgaria ("Counterparty"), each referred to individually as a "Party" or collectively as the "Parties" and supersedes all prior agreements between the Parties with respect to its subject matter and constitutes, along with the documents referred to in this Agreement and the Account Application, a complete and exclusive statement of the terms of the Agreement between the Parties with respect to its subject matter.

Article 1 - Scope of Agreement, Definitions and Contracting Procedure

1.1 Scope. This Agreement governs each transaction defined by the CEA as a "swap," including any "foreign exchange swap" and "foreign exchange forward" as defined in the CEA (each a **"Transaction"**) that the Parties may enter into from time to time after the date of this Agreement.

1.2 Definitions. Capitalized terms used in this Agreement are defined in
hereto, or, if not defined in Exhibit A hereto, have the meanings given in the 2006 ISDA Definitions published by ISDA and, as applicable, the 2005 ISDA Commodity Definitions published by ISDA, the 1998 FX and Currency Option Definitions published by ISDA, the Emerging Markets Traders Association and The Foreign Exchange Committee, and any other definitions specified in the relevant Confirmation for such Transaction, as published by or in conjunction with ISDA (collectively, the **"Definitions"**), except that any references to "Swap Transactions" in the Definitions will be deemed to be references to
"Transactions." The Definitions are incorporated by reference in, and made part of, this Agreement and each relevant Confirmation as if set forth in full in this Agreement and such Confirmation.

1.3 Single Agreement. The Parties may agree from time to time to enter into one or more Transactions, each of which shall be governed by this Agreement and the Confirmation with respect to such Transaction. In the event of any inconsistency between the terms of a specific Transaction (as set forth in the Confirmation for such Transaction) and any provision of this Agreement, the terms of such Confirmation shall control. This Agreement (including all exhibits and annexes hereto), all Confirmations, the Account Application, and all documents incorporated by reference therein form a single agreement between the Parties. Counterparty acknowledges and agrees that it is bound by the elections made by Counterparty in the Account Application.

1.4 Limited Undertaking. Neither Party commits, by entering into this Agreement, to enter into any individual Transaction with the other Party

1.5 Confirmations. The Parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). On or promptly following the date on which the Parties reach agreement on the terms of a Transaction, IFM will send a Confirmation to Counterparty via email outlining the commercial terms of such Transaction. Counterparty will immediately review the terms of each Transaction Confirmation to determine if it accurately reflects Counterparty's understanding of the terms of the Transaction, and if Counterparty believes the terms reflected in the Confirmation accurately reflect the Transaction, Counterparty shall confirm the same to IFM via email. If Counterparty believes there is any discrepancy between its understanding of the Transaction and the terms reflected in the Confirmation, Counterparty shall contact IFM via email (as set forth below) within two Business Days of receiving the Confirmation. If Counterparty has not accepted or disputed a Confirmation in the manner set forth above within two Business Days of receipt thereof, Counterparty will be deemed to have accepted all terms of such Confirmation absent manifest error.

20

INTL·FCStone®

Article 2 - Payments, Margin and Netting

**2.1 Payments.** Each Party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement. Payments shall be made on the due date, in the currency and to the account, each as specified in the Account Application or if not set forth in the Account Application, the relevant Confirmation. Where settlement is by delivery rather than by payment, delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation.

**2.2 Early Termination.** The Parties may liquidate or terminate a Transaction prior to maturity by written consent of both Parties, subject to a payment based upon revised Transaction terms adjusted to reflect prevailing rates over the remaining term of the Transaction. Any such payment shall be calculated by IFM.

**2.3 Initial Margin.** As security to maintain the Counterparty's position for each Transaction, IFM may request Counterparty to pay IFM an amount of cash calculated by IFM in its sole discretion as **"Initial Margin."** Payment of Initial Margin for a Transaction shall be made on the day such Transaction is initiated, as specified in the relevant Confirmation. IFM may reject or delay any Transaction prior to the payment of Initial Margin.

**2.4 Variation Margin.** As further security to maintain the Counterparty's position for each Transaction, Counterparty shall pay to IFM daily variation margin in the amount calculated by IFM in its sole discretion (**"Variation Margin"**). If IFM provides notice by 11:00 am New York time on any Business Day to Counterparty that a payment of Variation Margin is required, Counterparty shall pay such Variation Margin by 5:00 pm New York time on the same Business Day. If IFM provides any such notice after 11:00 am New York time on a Business Day, Counterparty shall pay the Variation Margin specified in such notice by 12:00 pm New York Time on the next Business Day. Upon Counterparty's request, IFM may return excess amounts of Variation Margin (as determined by IFM in its sole discretion), *provided*, that in no event shall the total amount of Initial Margin and Variation Margin deposited by Counterparty with respect to any Transaction be less than the Initial Margin with respect to such Transaction.

**2.5 Use of Margin.** Counterparty hereby pledges to IFM, as security for its obligations hereunder and under all Transactions, and grants to IFM a first priority continuing security interest in, lien on and right of set-off against all Margin transferred to or received by IFM hereunder. Upon the transfer by IFM to Counterparty of any Margin, the security interest and lien granted hereunder on that Margin will be released immediately, without any further action by either party. IFM shall be entitled to hold Variation Margin and, subject to any elections made by Counterparty in the Account Application, Initial Margin, itself or to appoint an agent (a **"Custodian"**) to hold Margin on its behalf. Upon Counterparty's election or notice by IFM to Counterparty of the appointment of a Custodian, or Counterparty's election to appoint a Custodian, Counterparty's obligations to make any transfer of Margin will be discharged by making the transfer to that Custodian. The holding of Margin by a Custodian will be deemed to be the holding of that Margin by IFM. Subject to any elections made by Counterparty in the Account Application with respect to Initial Margin, IFM shall be entitled to pledge, rehypothecate, invest, use, and commingle Margin deposited by Counterparty, free from any claim or right of any nature whatsoever. Upon the occurrence of an Event of Default with respect to Counterparty, IFM may exercise all rights as a secured party under Law or in contract, including the right to immediately apply Margin deposited by Counterparty against any amounts owed to IFM by Counterparty hereunder or under any other agreement. Following the termination of a Transaction, IFM shall return to Counterparty any Margin deposited by Counterparty with respect to such Transaction, net of any amounts owed by Counterparty with respect to such Transaction. Counterparty shall not be entitled to interest on any Margin deposited with IFM.

**2.6 Next Business Day.** If a payment is due under this Agreement on a day that is not a Business Day, then such payment shall be made on the next Business Day following the due date.

**2.7 Netting of Payment Obligations.** If payments are due from both Parties on the same day in the same currency, the Parties shall net the amounts due to one Party against the amounts due to the other Party, with the Party owing the greater aggregate amount paying to the other Party the difference between the amounts owed.

**INTL FCStone**

**2.8 Default Interest** If a party fails to remit any amount payable by it when due, interest on such unpaid portion shall accrue at the Default Interest Rate from (and including) the due date to (but excluding) the actual date of payment.

**2.9 Condition Precedent for Payment.** Each obligation of each Party to pay any amount due under this Agreement (other than an amount that is due under **Articles 5 or 6**) is subject to the condition precedent that no Event of Default (or event, act or omission which, with the passing of time and/or the giving of notice, will give rise to an Event of Default) has occurred and is continuing with respect to the other Party, *provided*, that any deferred payment obligation shall be accounted for and settled on a net basis on the later of (a) the date the relevant Event of Default or potential Event of Default is cured or waived, and (b) the scheduled termination date of the Transaction with the latest scheduled termination date in existence on the date the deferral commences.

**2.10 Tax Forms, Documents or Certificates** Each Party agrees to promptly provide to the other Party (or to such government or taxing authority as the other Party reasonably directs), any form, certificate or document required or reasonably requested by the other Party in order to allow such other Party to make a payment under the Agreement without any deduction or withholding for or on account of any tax, or with such deduction or withholding at a reduced rate.

**2.11 Disputed Statements.** If Counterparty, in good faith, disputes the amount (in whole or in part) of any invoice, statement or other payment demand, Counterparty shall pay to IFM the undisputed portion thereof, and the Parties shall work in good faith to resolve the dispute. If it is ultimately determined that Counterparty owes all or a portion of the disputed amount, Counterparty shall immediately pay to IFM that amount upon such determination with interest at the Default Interest Rate from and including the original due date to but excluding the date payment is actually made.

**2.12 Verification of Information.** In the event of a good faith dispute regarding payments to be made pursuant to any Transaction, each Party shall have the right to verify the accuracy of any invoice, payment demand, charge, payment or computation made under this Agreement by requesting copies of relevant portions of the books and records of the other Party, which records the other Party shall provide within a reasonable time. Any request for verification must be made within one (1) year after the date of the invoice or other item with respect to which the request is made.

ARTICLE 3 - Representations and Warranties

**3.1 Mutual Representations and Warranties.** Each Party represents and warrants to the other Party, as of the date of this Agreement (which representations will be deemed to be repeated by each Party on each date on which a Transaction is entered into):

(a) It is either an individual, or an entity duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing, as described in the Account Application;

(b) It is either an individual or a corporation, limited liability company or partnership or other entity described in the Account Application, and as applicable, created or organized under the laws of the jurisdiction identified on the first page of this Agreement, and it is a taxpayer of the jurisdiction identified in Section 7.1(a) below;

(c) It has the power to execute this Agreement and all other documents relating hereto to which it is a party (including the Account Application), to deliver this Agreement and each other document relating hereto that it is required hereby to deliver (including the Account Application), to perform its obligations under this Agreement and any obligations it has under any document relating hereto to which it is a party (including the Account Application), and has taken all necessary action to authorize such execution, delivery and performance;

(d) Such execution, delivery and performance do not violate or conflict with any Law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

**INTL FCStone**

(e) All governmental and other authorizations, approvals, consents, notices and filings that are required to have been obtained or submitted by it with respect to this Agreement or any document relating hereto to which it is a party have been obtained or submitted and are in full force and effect and all conditions of any such authorizations, approvals, consents, notices and filings have been complied with;

(f) Its obligations under this Agreement and any other document relating hereto to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a proceeding in equity or at law),

(g) No Event of Default with respect to it, or event which with notice and/or lapse of time would constitute an Event of Default, has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any document relating hereto to which it is a party;

(h) There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any document relating hereto to which it is a party or its ability to perform its obligations under the same;

(i) It has made its own independent decision to enter into each Transaction and as to whether such Transaction is suitable or appropriate for it based upon its own judgment and upon advice from its advisors that are unaffiliated with IFM as it has deemed necessary;

(j) It is not relying on any communication (written or oral) of the other Party as investment advice or as a recommendation to enter into that Transaction;

(k) It is not deeming any communication (written or oral) received from the other Party to be an assurance or guarantee as to the expected results of any Transaction;

(l) It is capable of assessing the risks and the merits of and understanding, and understands and accepts, the terms, conditions and risks of that Transaction; and

(m) It is capable of assuming, and assumes, the risks of the Transaction;

(n) The other Party has not given to it any assurance or guarantee as to the expected performance or result of this Agreement or any or all Transactions and Confirmations thereof;

(o) All information furnished in writing by or on behalf of it to the other Party was, on the date of its preparation, true, accurate and complete in every material aspect, such information continues to be true, accurate and complete in every material respect, and if there is a material change in the furnished information, it will provide updated information to the other Party within a reasonable period of time; and

(p) It is not required by any applicable Law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding for or on account of any Tax from any payment (other than payment of interest ) to be made by it to the other Party under this Agreement.

3.2 <u>Representations and Warranties of Counterparty</u>. Counterparty represents and warrants to IFM, as of the date of this Agreement (which representations will be deemed to be repeated by Counterparty on each date on which a Transaction is entered into):

(a) Counterparty is an "eligible contract participant" as defined in the CEA;

23

**INTL·FC**Stone®

(b) The information delivered by or on behalf of Counterparty in its Account Application is true, accurate and complete in all respects. All elections, representations, warranties and covenants made by Counterparty in such Account Application were authorized by Counterparty and are binding on Counterparty in accordance with their terms; and

(c) Counterparty shall notify IFM promptly (and in any event prior to entering into any Transaction) in the event any of the representations made by Counterparty in this Agreement or in the Account Application cease to be true and correct in all material respects.

**3.3 Agreement to Furnish Information.** Counterparty agrees to deliver to IFM, at or before the execution of this Agreement, a certified copy of a Certificate of Authority, Incumbency and Specimen Signatures and Resolutions adopted by Counterparty's Board of Directors, or relevant committee of the Board of Directors, authorizing the execution, delivery and performance of this Agreement and the Transactions contemplated hereunder.

**3.4 Further Protocols.** The Parties hereby agree that the Counterparty shall adopt all applicable Protocol elected by it in the Account Application and the Counterparty shall provide all information required by the Protocol or IFM, in order to make such elections. The Parties further acknowledge that ISDA and other organizations will publish further protocols, suggested amendments, market conventions and other standard contractual provisions (collectively, **"Protocols"**) intended to enhance the Parties' compliance with the CEA and other applicable Law, or to facilitate the orderly processing of Transactions. The Parties agree to work in good faith to incorporate such Protocols as are applicable to the relationship of the Parties under this Agreement. Without limitation of the foregoing, the Parties specifically anticipate incorporating further DF Protocols to be published by ISDA (each, a **"Further DF Protocol"**), and if IFM notifies Counterparty in writing that the provisions of any Further DF Protocol shall be incorporated in this Agreement, the provisions of such Further DF Protocol shall be deemed incorporated as of the date of such notice. In the event Counterparty disagrees with the incorporation of such Further DF Protocol, IFM may elect to terminate this Agreement and all Transactions, other than those Protocols that require Counterparty to provide IFM information in connection with the Protocol or Protocols that require Counterparty's express election.

**3.5 Cleared Transactions.** In the event that a Transaction is subject to mandatory clearing under Law, or Counterparty elects to clear a Transaction, upon acceptance of such Transaction by a derivatives clearing organization:

(a) The original Transaction shall be automatically extinguished;

(b) The original Transaction shall be replaced by equal and opposite Transactions with the derivatives clearing organization; and

(c) All terms of the Transaction shall conform to the product specifications of the cleared Transaction established under the derivatives clearing organization's rules.

ARTICLE 4  Financial & Regulatory Information

**4.1 Financial Information.** Counterparty shall deliver to IFM within 120 days following the end of each fiscal year a copy of its annual report and the annual report of its Guarantor, if any, containing in each case audited consolidated financial statements for such fiscal year certified by independent certified public accountants. If requested by IFM, Counterparty shall deliver within ninety (90) days after the end of each of its (and its Guarantor's) first three fiscal quarters of each fiscal year, a copy of its quarterly report and the quarterly report of its Guarantor, if any, containing unaudited consolidated financial statements for such fiscal quarter. In all cases the statements shall be for the most recent accounting period and prepared in accordance with accounting principles that are generally accepted in Counterparty's country of organization; *provided*, that if any such statements are not available timely due to a delay in preparation or certification, such delay shall not be considered a default so long as such Party diligently pursues the preparation, certification and delivery of the same. If such audited financial statements are not prepared on behalf of Counterparty or its Guarantor (if applicable), Counterparty shall provide a consolidated balance sheet and income statement as of the end of each of its fiscal quarters, with the applicable balance sheet and income statement delivered with respect to the fourth quarter of Counterparty's or its Guarantor's fiscal year containing annual information. If Counterparty or its Guarantor is an individual, Counterparty shall provide such financial information as may be otherwise agreed with IFM.

**INTL FCStone**

**4.2 Additional Information.** Each Party agrees promptly to provide the other Party with any information reasonably requested by such other party to enable such other party to comply with the CEA and other applicable Law in connection with any Transaction outstanding between the Parties hereunder. Each Party further agrees to enter into additional reasonable documentation or modify existing documentation between the Parties to satisfy the requirements imposed upon one or both of the parties by the CEA.

### ARTICLE 5 - Events of Default

**5.1 Remedies Upon Event of Default.** Upon an Event of Default, the Performing Party may do one or more of the following with respect to the Defaulting Party:

(a) Withhold or suspend all payments to the Defaulting Party required hereunder; and

(b) Upon written notice to the Defaulting Party, which notice shall be given not less than two Business Days and shall not exceed thirty (30) Business Days' prior to the Early Termination Date, designate in such written notice an Early Termination Date with respect to any or all Transactions outstanding at the time immediately preceding the Early Termination Date (the "**Terminated Transactions**"); *provided*, however, that with respect to a Party, where an Event of Default described in clause (c) of the definition of an Event of Default in **Exhibit A** below, is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then an Early Termination Date shall be deemed to have occurred immediately prior to any such Event of Default and no prior written notice shall be required. Neither Party shall have any obligation with respect to a Terminated Transaction other than an obligation to pay a Net Settlement Amount if applicable.

**5.2 Enforcement of Remedies.** The Performing Party may enforce any of its remedies under this Agreement or any Related Agreement successively or concurrently at its option. All of the remedies set forth in this Agreement are in addition to all other remedies available to the Performing Party at law or in equity.

**5.3 Net Settlement Amount.** Upon the occurrence or designation of an Early Termination Date pursuant to **Section 5.1(b)**, the Performing Party shall compute and shall notify the Defaulting Party of the Net Settlement Amount. Payment of the Net Settlement Amount shall be due within one (1) Business Day after (i) the date of computation in the case of any amount owing under this Section by the Performing Party, or (ii) the Defaulting Party's receipt of notice of the Net Settlement Amount in the case of any amount owing under this Section by the Defaulting Party. A Net Settlement Amount shall bear interest from (and including) the Early Termination Date until the date such amount is paid at the Default Interest Rate (for the Defaulting Party) or the Default Interest Rate minus 1% (for the Performing Party)

**5.4 Setoff.** In the event of termination and liquidation upon the occurrence or designation of an Early Termination Date pursuant to **Section 5.1**, IFM shall have the right (but shall not be obliged) without prior notice to Counterparty or any other person to set off any obligation of Counterparty owing to IFM or any Affiliate of IFM (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office of the obligation) against any obligation of IFM or any Affiliate of IFM owing to Counterparty (whether or not arising under this Agreement, whether or not matured, and regardless of the currency, place of payment or booking office of the obligation), provided that any amount not then due and payable that is included in such setoff, shall, if appropriate, be discounted to present value in a commercially reasonable manner by IFM. Each Party reserves to itself all other rights to which it is or may be entitled arising with respect to the other Party under this Agreement or any Confirmation or under Law. For the purpose of cross-currency set-off, IFM may convert either obligation at the applicable market exchange rate selected by IFM on the relevant date. This Section 5.4 shall not constitute or create a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

**5.5 Liquidated Damages.** The Parties agree that any amount recoverable under this Article 5 is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and, except as otherwise expressly provided in this Agreement, neither Party will be entitled to recover additional damages as a consequence of the termination of the Terminated Transactions

**INTL·FCStone**

### ARTICLE 6 - Event of Change/Accelerated Termination

**6.1 Event of Change.** "Event of Change" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any Law (or the application or interpretation of any Law, as determined by a court or regulatory authority of competent jurisdiction or as determined by the opinion of independent counsel mutually acceptable to the Parties) that occurs after the Trade Date of a Transaction which would result in (a) the imposition of a new tax in a material amount by any government or taxing authority upon the making of payments (other than payments of interest by either of the Parties with respect to such Transaction); or (b) the performance of any obligation of either of the Parties under such Transaction being unlawful.

If an occurrence that would give rise to an Event of Default also constitutes an Event of Change, such occurrence will be treated as an Event of Change.

**6.2 Good Faith Efforts.** Upon the occurrence of an Event of Change with respect to an Affected Transaction, the Parties agree to use reasonable efforts to make arrangements to avoid the Event of Change; **provided that** this subsection will not impose on either Party any obligation other than to negotiate in good faith to make arrangements that will not adversely affect such Party.

**6.3 Accelerated Termination Date.** If an Event of Change has occurred and is continuing with respect to an Affected Transaction, and if within twenty (20) Business Days of such occurrence an arrangement is not made pursuant to Section 6.2 above, then either Party may designate an accelerated termination date (**"Accelerated Termination Date"**) with respect to such Affected Transaction upon two (2) Business Days' notice to the other Party. The Party not adversely affected by the governmental or judicial action that is an Event of Change may elect to preserve any or all of the Affected Transactions by agreeing in writing, prior to the effectiveness of such notice of Accelerated Termination Date, to hold harmless the adversely affected Party pending reconsideration by such regulatory agency or court, or for the remaining term of the Transaction(s). Upon the designation of an Accelerated Termination Date with respect to an Affected Transaction, each Party shall deliver to the other Party a certificate containing in reasonable detail a computation, accompanied by such corroborating documentation as the other Party may reasonably request, of the Market Value of such Affected Transaction as determined by it. The payment to be made for such Affected Transaction will be equal to one-half of the difference between the Market Value determined by the Party ("X") with the higher Market Value and the Market Value determined by the Party ("Y") with the lower Market Value. X shall pay to Y the amount of the payment calculated pursuant to this Section 6.3 within two (2) Business Days after the Accelerated Termination Date. The intent of this Article 6 is to leave neither Party with an unfair burden as a result of an Event of Change.

### ARTICLE 7 - Notices and Payments

**7.1 Methods.** All invoices, statements, notices, and communications (and including, without limitation, notices pursuant to Article 5.1 and Article 6.3, and any notices of complaints made by Counterparty to IFM) made pursuant to this Agreement shall be in writing and made as follows:

(a) All written communications to the other Party shall be sent by first class, registered, certified or express mail, return receipt requested, postage prepaid, or by comparable delivery service, or by hand, by facsimile (with the original sent by first class mail) or by email addressed as follows:

# INTL FCStone

TO IFM:

INTL FCStone Markets, LLC
1251 NW Briarcliff Parkway, Suite 800
Kansas City, Missouri 64116
Attention: Chief Financial Officer
Facsimile No : 816-410-7454
Telephone No : 816-410-7129
Email: bill.dunaway@intlfcstone.com

Copies To:

INTL FCStone Markets, LLC
1251 NW Briarcliff Parkway, Suite 800
Kansas City, Missouri 64116
Attention: Chief Risk Officer
Telephone No.: 816-410-7145
Email: tricia.harrod@intlfcstone.com

Tax Jurisdiction: U.S.
Tax Identification No.: ███1604

To COUNTERPARTY:

| Field | Value |
|---|---|
| REGISTERED ADDRESS 1: | 5, Slavyanska Str., fl.4 |
| REGISTERED ADDRESS 2: | |
| CITY/REGION/POSTAL CODE: | Sofia, 1000 |
| COUNTRY: | Bulgaria |
| ATTN: | |
| PHONE: | +359 2 937 60 70 |
| FAX: | +359 2 937 60 80 |
| EMAIL: | stanislav@3artfood.bg |
| Tax Jurisdiction: | Bulgaria |
| Tax Identification No.: | ███3310 |

(b) Either Party may modify any information specified in this Section 7.1 by giving written notice to the other Party.

7.2 **Receipt.** All written communications made as provided in Section 7.1 shall be deemed given upon receipt by the Party to which addressed which, in the case of facsimile or email, shall be deemed to occur at the time transmitted on any Business Day. All payments due under this Agreement shall be deemed received upon their unconditional availability as good funds in the payment account of the receiving Party specified in Section 7.1.

ARTICLE 8 - General Provisions

8.1 **Entire Agreement; Modification.** The terms of this Agreement (including the Account Application and all documents incorporated by reference therein) and the Confirmation for any Transaction entered into pursuant to this Agreement constitute the entire agreement between the Parties with respect to the matters set forth in this Agreement and with respect to any Transaction and supersede any and all negotiations, agreements, and expressions of intent, written or oral, prior hereto. Except as set forth in Section 8.5, this Agreement may be modified only by written agreement executed by both Parties. This Agreement (including the Account Application and all documents incorporated by reference therein), any Confirmation, and any modification of the foregoing may be executed and delivered in counterparts, including by a facsimile or email transmission thereof, each of which shall be deemed an original.

8.2 **No Waiver.** No waiver by either Party of any one or more defaults by the other Party in the performance of any of the provisions of this Agreement or the Confirmation for any Transaction shall operate or be construed as a waiver of any other default or defaults whether of a like kind or different nature. Any failure or delay by either Party to exercise any right, in whole or in part, will not be construed as a waiver of the right to exercise the same or any other right at any time and from time to time hereunder.

8.3 **Headings.** The headings used for the articles and sections herein are for convenience only and shall not affect the meaning or interpretation of the provisions of this Agreement or any Transaction or Confirmation hereunder.

**INTL FCStone**

**8.4 Confidentiality.** All Confidential Information shall be held and treated by the Parties and their agents in confidence, used solely in connection with this Agreement, and shall not, except as hereinafter provided, be disclosed to any third party without the other Party's prior written consent except (i) as may be required by Law, (ii) in response to a request from a governmental body or regulator, in each case having or asserting jurisdiction over the relevant Party, or (iii) as necessary to permit enforcement of this Agreement. In the event that either Party (a **"Disclosing Party"**) is otherwise requested or required to disclose any Confidential Information, the Disclosing Party shall provide the other Party with prompt written notice of any such request or requirement, if such notice is practicable and, based on advice of the Disclosing Party's counsel, permitted by Law, so that the other Party may seek an appropriate protective order or waive compliance with the provisions of this Agreement. If, failing the entry of a protective order or the receipt of a waiver hereunder, the Disclosing Party, based on the advice of counsel, is compelled to disclose Confidential Information, the Disclosing Party may disclose that portion of the Confidential Information which the Disclosing Party's counsel advises that the Disclosing Party is compelled to disclose.

**8.5 Severability Clause.** If any Law adopted following the date of this Agreement, or any interpretation of any Law made following the date of this Agreement, shall be inconsistent with any of the provisions hereof, the affected provisions of this Agreement shall be deemed modified or superseded, as the case may be, by the applicable provisions of such Law, and all other provisions of this Agreement and provisions so modified shall in all respects continue in full force and effect.

**8.6 Governing Law, Jurisdiction and Costs.** This Agreement and any Transaction, including any Confirmation thereof, entered into pursuant to this Agreement shall be governed by, construed and enforced in accordance with the law of the State of New York without regard to principles of conflict of laws. Any judicial action arising out of, resulting from or in any way relating to this Agreement, the Confirmation for any Transaction or any Related Agreement or any alleged breach or default under the same or the warranties and representations contained in the same shall be brought only in a state or federal court of competent jurisdiction located in the State of New York, in the Borough of Manhattan in New York City. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREUNDER.

**8.7 Service of Process.** Counterparty irrevocably appoints the Process Agent specified below to receive, for it and on its behalf, service of process in any proceedings. If for any reason any Party's Process Agent is unable to act as such, such Party will promptly notify the other Party and within 30 days appoint a substitute process agent acceptable to the other Party. The Parties irrevocably consent to service of process given in the manner provided for notices in Section 7.1. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law

**Counterparty appoints as Process Agent:**

| | |
|---|---|
| Process Agent: | |
| Registered Address: | |
| City/Region/Postal Code: | |
| Country: | |

To the extent Counterparty fails to appoint a Process Agent located in the State of New York above, within ten (10) business days of written request, Counterparty will appoint an agent for service of process in the State of New York and provide to IFM written notice of said appointment. If after ten (10) business days Counterparty fails to provide written notice to IFM of said appointment, IFM will be authorized, for the purpose of effecting valid service of process in the State of New York, to serve Counterparty by certified mail directed to the address for notices listed in Article 7 above.

**8.8 Limitation on Liability.** NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OS SUCH DAMAGES AND NOT A PENALTY.

## INTL FCStone

IFM shall not be liable to Counterparty as a result of any action taken by IFM or its agents in compliance with applicable Law or at the direction of the CFTC or the National Futures Association. This paragraph is solely for the protection and benefit of IFM, and any failure by IFM or its agents to comply with any of Law or order of the CFTC or the National Futures Association shall not relieve Counterparty of any obligations under this Agreement nor be construed to create rights under this Agreement in favor of Counterparty against IFM.

### 8.9 Bankruptcy Matters.

(a) This Agreement, including any credit support arrangement entered into between the parties, is a "master netting agreement" as defined in the U.S. Bankruptcy Code (the "Code"), and this Agreement, including any credit support document, and each Transaction hereunder is of a type set forth in Section 561(a)(1)-(5) of the Code. The remedies provided herein, and in any credit support arrangement, are the remedies referred to in Section 561(a), Sections 362(b) (6), (7), (17) and (27), and Section 362(o) of the Code. All transfers of cash, securities or other property as Margin or otherwise under or in connection with this Agreement, any credit support arrangement or any Transaction hereunder are "margin payments," "settlement payments" and "transfers" under Sections 546(e), (f), (g) or (j), and under Section 548(d)(2) of the Code. Each obligation under this Agreement, any credit support arrangement or any Transaction hereunder is an obligation to make a "margin payment," "settlement payment" and "payment" within the meaning of Sections 362, 560 and 561 of the Code.

(b) In the event either Party is a covered financial company (as defined in section 201(a)(8) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. 5381(a)(8)) or an insured depository institution for which the Federal Deposit Insurance Corporation ("FDIC") has been appointed as a receiver (the "covered party"), certain limitations under Title II of the Dodd-Frank Act or the Federal Deposit Insurance Act may apply to the right of the non-covered party to terminate, liquidate, or net any swap by reason of the appointment of the FDIC as receiver, notwithstanding the agreement of the Parties hereunder. The FDIC may have certain rights to transfer Transactions of the covered party under section 210(c)(9)(A) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. 5390(c)(9)(A), or 12 U.S.C. 1821(e)(9)(A).

**8.10 No Third Party Beneficiaries** This Agreement and any Confirmation pursuant hereto confer no rights whatsoever upon any person other than the Parties and shall not create, or be interpreted as creating, any standard of care, duty or liability to any person not a Party hereto.

**8.11 Binding Effect.** This Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and permitted assigns, except as expressly provided in this Agreement or the Confirmation for a specific Transaction.

**8.12 Assignment.** This Agreement, including any Transactions hereunder, shall not be assigned by either Party without the written consent of the other Party, and any such purported assignment without consent shall be void; *provided* that either Party may assign all of its rights and obligations under this Agreement and all Transactions pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity that is able to make all of the representations and warranties applicable to such Party hereunder (but without prejudice to any other right or remedy under this Agreement), that assumes all obligations of the assigning Party, and whose creditworthiness is not materially weaker
(taking into consideration any credit support provided both prior to and following the effectiveness of such assignment) than the creditworthiness of the assignor before such transfer and assumption.

**INTL FCStone®**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first written above.

INTL FCStone Markets, LLC
By: _[signature]_
Printed Name: Aaron Schroeder
Title: Authorized Signatory

By: _[signature]_
Printed Name: Scott Thein
Title: Vice President - Risk Counsel

Counterparty:

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| | AGRO SANTINO OOD |
| | Print Customer Entity Name |
| Print Customer Name | Stanislav Goranov Georgiev |
| | Print Signatory Name |
| Signature _____ Date __/__/__ Day/Month/Year | Executive |
| | Title |
| | Signature _[signature]_ Date 19/September/2017 |
| | Mladen Krasimirov Antonov |
| Print Joint Customer Name | Print Signatory Name |
| | Executive |
| | Title |
| Signature _____ Date __/__/__ Day/Month/Year | Signature _[signature]_ Date 19/September/2017 |

30

**INTL FCStone**

EXHIBIT A: DEFINITONS

"**Accelerated Termination Date**" means the date determined in accordance with Section 6.3.

"**Account Application**" means all documentation delivered to IFM and its Affiliates in connection with the opening of accounts, including all know-your-customer information, as may be updated by Counterparty from time to time.

"**Affected Transaction**" means any Transaction as to which an Event of Change (as defined in Article 6) shall occur.

"**Affiliate**" means, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person, or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"**Business Day**" means any calendar day, other than a Saturday or Sunday, on which banks are open for general commercial business in New York.

"**CEA**" means the United States Commodity Exchange Act, as amended from time to time, and the regulations thereunder.

"**Confidential Information**" means non-public, proprietary or confidential information that is labeled as such or should reasonably be understood by the recipient to be confidential, and includes the terms of each specific Transaction, including but not limited to the price, the quantity, the identity of other sellers or intermediaries, and all other material terms thereof. Notwithstanding the foregoing, the following shall not constitute "Confidential Information":

(a) information that is generally known to the industry or the public other than as a result of the recipient's breach of this Agreement;

(b) information that is made legitimately available to a recipient by a third party without breach of any confidentiality obligation; or

(c) information that is developed by employees or contractors of such recipient without knowledge of or access to Confidential Information.

"**Confirmation**" means a written notice confirming the terms of a Transaction.

"**Default Interest Rate**" means a rate equal to the cost to the Party to whom interest is owed (as such cost is certified by such Party, without proof or evidence of any actual cost) if such Party were funding the relevant amount plus 1% per annum, but in no event exceeding the maximum rate permitted by applicable Law.

"**Defaulting Party**" means the Party with respect to which (or whose Guarantor with respect to which) an Event of Default has occurred.

"**Disclosing Party**" is defined in Section 8.4.

"**Early Termination Date**" means a date for termination of the Agreement and any Related Agreement and all the Parties' obligations under the same, other than the obligations set forth in Sections 5.3 [Net Settlement Amount] and 5.4 [Setoff] of the Agreement.

"**Event of Change**" is defined in Section 6.1.

31

**INTL·FC**Stone®

"Event of Default" means

(a) The failure of either Party or any Guarantor to make payment as required or perform any obligations (i) under this Agreement or under any Confirmation (excluding a delay in payment that is cured within one (1) Business Day of demand therefor, or any other failure of performance that is cured in a manner satisfactory to the Performing Party in its sole discretion within five (5) Business Days of a demand for cure); provided, that the failure of Counterparty to make a payment of Variation Margin within the timeframe required by Section 2.4 shall constitute an immediate Event of Default with or without demand by IFM; (ii) under any Related Agreement, after giving effect to any applicable notice or grace period thereunder, or (iii) under any Transaction;

(b) The repudiation by either Party or any Guarantor of any obligation (i) under this Agreement, any Transaction, or the Confirmation for a specific Transaction; or (ii) under any Related Agreement;

(c) Either Party or any Guarantor:

    (i)    is dissolved (other than pursuant to a consolidation, amalgamation or merger);

    (ii)    becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

    (iii)    makes a general assignment, arrangement or composition with or for the benefit of its creditors;

    (iv)    institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof;

    (v)    has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

    (vi)    seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

    (vii)    has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter;

    (viii)    causes or is subject to any event with respect to it which, under the applicable Laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive); or

    (ix)    takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(d) The merger of either Counterparty or any Guarantor of Counterparty with any other person or the consolidation of either Counterparty or any Guarantor of Counterparty with any other person which (i) causes a material adverse change in the financial condition of Counterparty or its Guarantor or (ii) pursuant to which the entity existing after the transfer, merger or consolidation does not assume the obligations of Counterparty or its Guarantor by operation of Law or otherwise;

**INTL FCStone**

(e) The transfer of all or substantially all of the assets of either Counterparty or any Guarantor;

(f) To the extent Counterparty is a natural person, Counterparty's death or incompetency;

(g) The failure of Counterparty or any Guarantor of Counterparty to make payment when due under one or more agreements or instruments relating to Specified Indebtedness in an aggregate amount (individually or collectively) of not less than one million dollars ($1,000,000) which has resulted in such Specified Indebtedness becoming due and payable under such agreements or instruments, before it would otherwise have been due and payable, or defaults in making one or more payments in an aggregate amount (individually or collectively) of not less than one million dollars ($1,000,000) under such agreements or instruments (after giving effect to any applicable notice requirement or grace period); or

(h) The making of a materially incorrect or misleading representation or warranty under this Agreement or any Related Agreement.

**"Guarantor"** means, as to a Party, the person(s), if any, executing a guaranty of any or all of the obligations of such Party to the other Party relating to a Transaction pursuant to the Agreement.

**"ISDA"** means the International Swaps and Derivatives Association, Inc.

**"Law"** means any U.S. or foreign, federal, state, provincial or local law, ordinance, regulation, rule, code, order, other requirement or rule of law, stock exchange rule or rule of any self-regulatory organization. The terms "lawful" and "unlawful" will be construed accordingly.

**"Margin"** means both Initial Margin and Variation Margin.

**"Market Value"** means, with respect to any Terminated Transaction, the amount (as determined by the Performing Party) of the losses (expressed as a positive number) or gains (expressed as a negative number) that the Performing Party calculates would be realized in replacing that Terminated Transaction. In determining a Market Value, the Performing Party may consider any relevant information, including, without limitation, one or more of the following types of information:

(a) quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Performing Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Performing Party and the third party providing the quotation;

(b) information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(c) information of the types descried in clause (a) or (b) above from internal sources (including any of the Performing Party's Affiliates) if that information is of the same type used by the Performing Party in the regular course of its business for the valuation of similar transactions.

**"Net Settlement Amount"** means the single liquidated amount payable by one Party to the other, following the occurrence or designation of an Early Termination Date, after netting:

(a) the amount owed by the Defaulting Party to the Performing Party by taking the sum of:

    (i) the absolute value of all negative Market Values with respect to the Terminated Transactions, and

**INTL·FCStone®**

(ii) any unpaid amounts owed to the Performing Party by the Defaulting Party pursuant to Article 2 or a Related Agreement immediately before the Early Termination Date, and

(iii) all reasonable damages, losses,
and out-of-pocket expenses, including legal fees, incurred by the Performing Party by reason of terminating or liquidating the Terminated Transactions pursuant to the Early Termination Date, including without limitation any damages, losses and expenses incurred in obtaining, maintaining or liquidating hedges relating to the Transactions that are being liquidated; and

(b) the amount owed by the Performing Party to the Defaulting Party by taking the sum of:

(i) all positive Market Values with respect to the Terminated Transactions, and

(ii) any unpaid amounts owed to the Defaulting Party by the Performing Party pursuant to Article 2 or a Related Agreement immediately before the Early Termination Date, all as determined in a commercially reasonable manner by the Performing Party.

"**Performing Party**" means, upon the occurrence of an Event of Default, the non-defaulting Party with respect to such Event of Default.

"**Related Agreement**" means any collateral, security, guaranty or other agreement undertaken in connection with the Agreement.

"**Specified Indebtedness**" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"**Tax**" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or other similar tax.

"**Terminated Transaction**" is defined in Section 5.1(b).

"**Trade Date**" has the meaning ascribed to it in the relevant ISDA Definitions.

"**Transaction**" is defined in Section 1.1.